*866 ON MOTION FOR REHEARING
We deny appellants’ motions for rehearing. However, we respond to the motions by adding to our discussion in our original opinion on the issue of sovereign immunity. Also, we add discussion on the issue of jury rapport, which was duly considered but not previously discussed.
I
The first issue is that of sovereign immunity. In our original decision, we expressed our concurrence with Southern Alliance Corporation v. City of Winter Haven, 505 So.2d 489 (Fla. 2d DCA 1987). We reaffirm that concurrence here and hold that nothing in Lloyd v. Ellis, 520 So.2d 59 (Fla. 1st DCA 1988), nor in Chapman v. State Dept. of Health and Rehabilitative Services, 517 So.2d 104 (Fla. 3d DCA 1987), dissuades us.
Our companion court, in Southern, relied upon two decisions of the United States Supreme Court. In the first case, Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the court made a very lengthy, complete analysis of the legislative history of 42 U.S.C. § 1983. That analysis concludes with the following holding at 436 U.S. 690-92, 98 S.Ct. at 2035-37, 56 L.Ed.2d at 635-37.
Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory* or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body’s officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 “person,” by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental “custom” even though such a custom has not received formal approval through the body’s official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970): “Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a ‘custom or usage’ with the force of law.”
On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.
We begin with the language of § 1983 as originally passed:
“[A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject or cause to be subjected, any person .. to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, under such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action of law, suit in equity, or other proper proceeding for redress_” 17 Stat. 13. (emphasis added).
The italicized language plainly imposes liability on a government that, under color of some official policy, “causes” an employee to violate another’s constitutional rights. At the same time, that *867 language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor. Indeed, the fact that Congress did specifically provide that A’s tort became B’s liability if B “caused” A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent. See Rizzo v. Goode, 423 U.S. 362, 370-371, 96 S.Ct. 598, 602, 46 L.Ed.2d 561 (1976).
(footnotes omitted) (emphasis in original).
The second case, Owen v. City of Independence, Missouri, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) was more factually similar to the present case than Mo-nell. Owen involved the discharge of a police chief and his subsequent action against the city, city manager, and members of the city council. The court rejected the defendants’ claim of qualified immunity and said at 445 U.S. 650-52, 100 S.Ct. at 1415-16, 63 L.Ed.2d at 693-94:
Our rejection of a construction of § 1983 that would accord municipalities a qualified immunity for their good-faith constitutional violations is compelled both by the legislative purpose in enacting the statute and by considerations of public policy. The central aim of the Civil Rights Act was to provide protection to those persons wronged by the “ ‘[mjisuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.’ ” Monroe v. Pape, 365 U.S. [167], at 184, 81 S.Ct. [473], at 482, [5 L.Ed.2d 492 (1961)] (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). By creating an express federal remedy, Congress sought to “enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.” Monroe v. Pape, supra, 365 U.S., at 172, 81 S.Ct., at 476.
How “uniquely amiss” it would be, therefore, if the government itself — “the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct” — were permitted to disavow liability for the injury it has begotten. See Adickes v. Kress & Co., 398 U.S. 144, 190, 90 S.Ct. 1598, 1620, 26 L.Ed.2d 142 (1970) (opinion of BRENNAN, J.). A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed. Yet, owing to the qualified immunity enjoyed by most government officials, see Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), many victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense. Unless countervailing considerations counsel otherwise, the injustice of such a result should not be tolerated.
Moreover, § 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. See Robertson v. Wegmann, 436 U.S. 584, 590-591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978); Carey v. Piphus, 435 U.S. 247, 256-257, 98 S.Ct. 1042, 1048-1049, 55 L.Ed.2d 252 (1978). The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens’ constitutional rights. Furthermore, the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights. Such procedures are particularly beneficial in preventing those “systemic” *868 injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith. Cf. Note, Developments in the Law: Section 1983 and Federalism, 90 Harv.L.Rev. 1133, 1218-1219 (1977).
(footnotes omitted).
The Owen Court then said at 445 U.S. 654-65, 100 S.Ct. at 1417-18:
It hardly seems unjust to require a municipal defendant which has violated a citizen’s constitutional rights to compensate him for the injury suffered thereby. Indeed, Congress enacted § 1983 precisely to provide a remedy for such abuses of official power. See Monroe v. Pape, 365 U.S., at 171-172, 81 S.Ct., at 475-476. Elemental notions of fairness dictate that one who causes a loss should bear the loss.
It has been argued, however, that revenue raised by taxation for public use should not be diverted to the benefit of a single or discrete group of taxpayers, particularly where the municipality has at all times acted in good faith. On the contrary, the accepted view is that stated in Thayer v. Boston— “that the city, in its corporate capacity, should be liable to make good the damage sustained by an [unlucky] individual, in consequence of the acts thus done.” 36 Mass. [511], at 515 [ (1837) ]. After all, it is the public at large which enjoys the benefits of the government's activities, and it is the public at large which is ultimately responsible for its administration. Thus, even where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated. See generally 3 K. Davis, Administrative Law Treatise § 25.17 (1958 and Supp. 1970): Prosser § 131, at 978; Michelman, Property, Utility, and Fairness: Some Thoughts on the Ethical Foundations of “Just Compensation” Law, 80 Harv.L. Rev. 1165 (1967).
The second rationale mentioned in Scheuer also loses its force when it is the municipality, in contrast to the official, whose liability is at issue. At the heart of this justification for a qualified immunity for the individual official is the concern that the threat of personal monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official’s decisiveness and distorting his judgment on matters of public policy. The inhibiting effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed. First, as an empirical matter, it is questionable whether the hazard of municipal loss will deter a public officer from the conscientious exercise of his duties; city officials routinely make decisions that either require a large expenditure of municipal funds or involve a substantial risk of depleting the public fisc. See Kostka v. Hogg, 560 F.2d 37, 41 (CA 1 1977). More important, though, is the realization that consideration of the municipality’s liability for constitutional violations is quite properly the concern of its elected or appointed officials. Indeed, a decisionmaker would be derelict in his duties if, at some point, he did not consider whether his decision comports with constitutional mandates and did not weigh the risk that a violation might result in an award of damages from the public treasury. As one commentator aptly put it: “Whatever other concerns should shape a particular official’s actions, certainly one of them should be the constitutional rights of individuals who will be affected by his actions. To criticize section 1983 liability because it leads decisionmakers to avoid the infringement of constitutional rights is to criticize one of the statute’s raisons d’etre.”
(footnotes omitted) (emphasis in original).
II
The second issue, which we have not previously discussed, is the brief question *869 and answer session during plaintiffs closing argument which the trial court permitted and over which it maintained appropriate control. The defendants have argued this point in their briefs. We found neither prejudice nor harm nor error, but neglected to mention it. We do so now only because of our earlier omission.
DELL and GUNTHER, JJ., concur.